Waller *v.* Harris.

## Waller, *appellant*, and Harris, *respondent.*

To entitle a *creditor* to *redeem lands* sold under execution, the requirements of the statute, as to the evidence to be produced by him showing his *right* to redeem, must be strictly complied with; and accordingly, where a creditor omitted to produce, within the time prescribed by the statute, *a copy of the docket of the judgment* under which he claimed to redeem, it was held, that though a deed was executed to him by the sheriff, that his title was defective, and that a bill in equity filed by him to *redeem* the premises sold under a *foreclosure of a mortgage by advertisement* could not be sustained.

*It was further held,* that though the money paid by the creditor in his attempt to redeem, was actually paid over and received by the original purchaser at the sheriff's sale, that such facts were unavailing where it appeared that the money was received by the purchaser under a *misrepresentation* that the requirements of the statute had been complied with, and that the original purchaser had offered to refund such money.

*It seems,* that the defence set up in this case would not have been allowed had it been objected to in due time; that the purchaser at the sale ought to have applied to the court from whence the process issued, or filed a cross-bill in chancery, to avoid the sheriff's deed—but having litigated the question of the validity of the deed in the courts below, it was held that the grantee was not at liberty in the court of *dernier resort,* for the first time, to raise the question.

Appeal from chancery. The appellant filed a bill against the respondent before the vice chancellor of the fourth circuit, to *redeem* a lot of land sold under a *foreclosure of a mortgage,* executed by one *Daniel Mason* to *William Stevenson* in the year 1824, of which the respondent had become the assignee, and which was foreclosed by her. The title set up by the appellant as the foundation of his right to redeem was a *sheriff's deed* of the premises, executed to him on the 5th November, 1833, under this state of facts : On the 12th July, 1825, one *Calvin Barker* obtained a judgment against *Daniel Mason,* the above mortgagor, and another person, on which an execution was issued, and the premises in question sold at public vendue on the 25th day of *July,* 1832, and struck off to the respondent for the sum of $801, the amount due on the judgment on the day of sale. On the 25th day of *October,* 1833, (*fifteen months* after the day of sale,) the appellant called on the sheriff and

claimed the right to redeem the property. He delivered to the sheriff an *affidavit*, setting forth that he held a judgment in his own name against *Daniel Mason* and another person, docketed 10th February, 1832, on which he claimed the sum of $681.85 to be due ; and also delivered to the sheriff an execution which had been issued upon such judgment, and paid to him for the benefit of the respondent the sum of $871.09, the amount of her *bid* at the sale of the property, by virtue of the execution in favor of Barker, and the *interest* thereof. On the *next day*, i. e., on the *twenty-sixth day of October*, the appellant delivered to the sheriff *a copy of the docket of the judgment* under which he had on the preceding day claimed to redeem. On the 30th October, the money paid by the appellant to the sheriff was received from him by an agent of the respondent, who on the 1st November paid over the same to the respondent. Previous to receiving the money from the sheriff, the agent of the respondent enquired of him whether a *certificate of the docket of the judgment* of the complainant had been delivered to him, and was informed that it had been delivered ; but the *time* of the delivery was not stated by the sheriff. Subsequently, however, it was discovered that though a copy of the docket of the judgment had been delivered, it was not delivered until the *twenty-sixth* day of October, and the respondent thereupon offered to *refund* the money received by her from the sheriff, which the appellant refused to accept.

The premises were sold under the mortgage on 31st *January*, 1833, and bought in by an agent of the respondent, and on the same day the title, by virtue of such sale, was vested in the respondent. On the *eighth* day of *November*, 1833, the appellant *tendered* the amount due upon the mortgage on the day of sale, together with the interest thereof, and the costs of foreclosing, in full payment and satisfaction ; which money thus tendered the respondent refused to accept. Twelve days thereafter, the appellant filed his bill to redeem. The vice chancellor decreed a *redemption* of the mortgaged premises ; which decree on appeal was *reversed* by the chancellor, and the bill dismissed with costs.

Whereupon Waller, the complainant below, appealed from the decree of the chancellor to this court, where the cause was argued by

*A. Taber*, for the appellant.

*J. Holmes & S. Stevens*, for the respondent.

After advisement, the following opinions were delivered :

By Chief Justice NELSON. Although this case is quite voluminous, and the points presented somewhat diffuse, it involves but a single question : and that is, whether Waller, the appellant, entitled himself to the benefit of the purchase of the premises under the judgment in favor of Barker, and consequently to the sheriff's deed, by virtue of his attempt to redeem on the 25th October, 1833 ? If he did, he acquired the interest of *Mason*, the mortgagor, in the premises, and of course the equity of redemption, and is entitled to pay off the mortgage, for the purpose of so far disencumbering his estate. If he did not effectually redeem, and failed to acquire the *interest* of Mason, then the respondent having by virtue of her purchase become entitled to all the estate that Mason had in the premises, she of course had possessed herself of the equity of redemption, and the appellant had no right to redeem the premises from the effect of the sale under the mortgage.

The idea that Waller may still redeem the mortgage, notwithstanding Mrs. Harris took the interest of Mason under the Barker judgment, is altogether fallacious. After that, he is a stranger, for his judgment being younger, is no longer a lien on the premises ; all the estate of Mason, (the defendant in the judgment,) on which it could attach, having passed out of him to Mrs. Harris, by title paramount. I am aware it was said that Mrs. Harris lost the benefit of her purchase by subsequently foreclosing the mortgage, and that for that reason Waller's judgment comes in next to it ; and as the foreclosure is not conclusive upon judgment creditors, he thus makes out his right. This view is certainly ingenious, and if we are bound to yield to it,

will operate successfully, through the forms of law, to cheat (if I may be allowed the term) Mrs. Harris out of the purchase money paid on the sale under the execution, for the benefit of a junior judgment creditor. But the law is subject to no such reproach. After the sale under the execution, Mrs. Harris bought in the mortgage, and took an assignment ; thereby possessing herself of both the interest of the mortgagor and mortgagee ; the foreclosure, therefore, was a work of supererogation as regarded junior liens on the equity of redemption. The whole estate had been swept from under them, and vested in her by title paramount. It is true that her title to the equity of redemption under the sale upon the judgment was inchoate, and has been intercepted, if the appellant can maintain his deed from the sheriff, but if not, as she was entitled to it, on the 25th October her right became perfect, and related back to the day of the sale ; and on that day, in judgment of law, she was the owner of this equity. The question, therefore, in any legal view of the case, is narrowed down to the redemption of the sale under the Barker judgment.

Now it must be borne in mind, that *redemption of lands* under execution, is a creature of the statute, 2 *R. S.* 370 *to* 374, unknown to the common law, and hence it is obvious we must look to its provisions alone for the steps necessary to acquire a right under it. Before the act of 1820, *Sess. Laws,* 167, the purchaser was entitled to his deed on payment of the purchase money, by which the title passed absolutely. By that act, a system was devised which in effect extended a credit of fifteen months to the judgment debtor from the sale ; and within which time he, or any assignee of his interest, or any junior judgment creditor, at the respective periods designated in the statute, upon complying with certain conditions therein prescribed, might redeem the purchase and take the deed. The act did not prescribe the evidence of the existence, amount, or ownership of the judgment under which the redemption was sought. The right was put upon the facts, i. e. 1st. The ownership of a junior judgment, which was a lien ; and 2d. The payment of the

Waller *v.* Harris.

money within fifteen months. Upon this being shewn, the right followed. In 1 *Cowen*, 443, the court suggest that an exemplification of the judgment would be proper evidence; but in 4 *id.* 420, whether such evidence need be produced or not, is made to rest in the discretion of the sheriff. To guard against the abuse that might grow out of the arbitrary exercise of this discretion, and establish a fixed rule by which parties could act understandingly in the steps to be taken, the statute, 2 *R. S.* 373, § 60, provides, that, " *To entitle any creditor to acquire the title of the original purchaser, or to become a purchaser from any other creditor, pursuant to the foregoing provisions, he shall present,*" 1. A copy of the docket of the judgment under which he claims, &c.; 2. A true copy of all assignments, verified by affidavit; and 3. An affidavit of the true sum due on the judgment, &c. If any meaning or effect is to be given to this section, proof of the ownership of the judgment and payment of the money is not enough; because it declares that to *entitle* the creditor *to acquire the title of the purchaser*, pursuant to them, he must, in addition, furnish the aforesaid evidence; this seems to be made in terms as imperative as the *existence* of the judgment, or payment of the money. This conclusion is also greatly confirmed by recurring to the consideration before stated, i. e. that this proceeding is a creature of the statute; a complete system of itself, and a strict compliance with all the requirements is essential, upon well settled principles, in order to claim a benefit under it. I know that statutes are sometimes construed to be only *directory*, and then latitude is allowed; but it is otherwise where the provisions are peremptory. If we also recur to the defect of the law of 1820, and the danger of abuses under it, through the partiality and favoritism of the numerous officers charged with its execution, we are strikingly admonished against frittering away, by doubtful construction, this salutary check. Our bias should incline in favor of regulating discretion, and of adhering strictly to a provision which will enable all parties in interest, and officers to act understandingly in either claiming or dispensing its benefits.

The reception of the money· cannot, I think, under the circumstances, prejudice the rights of the respondent. I am, therefore, in favor of affirming the decree.

By Mr. Justice Bronson. If the appellant failed to effect a valid redemption from the sale under the Barker judgment, there is no ground on which he can maintain a claim to redeem from the mortgage. The sale on execution transferred all such interest as Mason, the debtor, had in the land at the time the judgment was docketed; and when at the end of fifteen months the sale ripened into a title, it necessarily destroyed the lien of all junior incumbrances. The lien of the appellant's judgment was at an end, and from that time he was a mere stranger, having neither right nor interest to redeem from the mortgage.

The fact that there had been a statute foreclosure of the mortgage and a purchase under it by the respondent within the fifteen months, cannot alter the case. That proceeding barred the equity of redemption of the mortgagor, and all persons claiming title under him; but those who had obtained judgment liens on the mortgaged premises were not affected, 2 *R. S.* 546, § 8. The Barker judgment and the sale under it were as little prejudiced by the foreclosure of the mortgage as was the judgment of the appellant. Notwithstanding the foreclosure, both judgments continued to be liens on the property until a title was perfected under the first, and then the lien of the junior judgment was extinguished. The appellant must therefore rest his case, as he does in the bill, on the ground—not that he is a judgment creditor merely—but that, being a judgment creditor, he redeemed from the sale under the Barker judgment, and thus acquired the title or equity of redemption of Mason, the mortgagor and judgment debtor.

This brings us to the real question in the cause. Was there a valid redemption from the sale under the Barker judgment? The appellant delivered to the sheriff an execution which had been issued on his judgment, but did not present a copy of the docket. The statute declares, that to entitle a creditor to redeem he shall present to and leave with the officer who made the sale,

*a copy of the docket of the judgment* under which he claims, duly certified, &c. 2 *R. S.* 373, § 60. The language is too plain and explicit to admit of two interpretations. The provision is, not that the creditor *may*, but that he *shall* present a copy of the docket. It is not in the alternative, allowing a copy of the docket, *or some other satisfactory evidence.* It is not a mere *direction* to the officer, but *a qualification of the right of the creditor.* He must not only have a judgment, but *to entitle* him to redeem he must present the specified evidence. There is no room for construction ; and I do not see how we can hold this a valid redemption without repealing the statute.

The act of 1820 did not prescribe the evidence to be produced by a creditor claiming the right to redeem. The consequence was that this matter was left, in a great degree, to the discretion of the sheriff and his deputies. Different officers were at liberty to adopt different rules of proceeding ; and the same officer might sometimes receive, and at other times reject the same kind of evidence. Besides leaving the parties in doubt and uncertainity about their legal rights, a wide door was left open for favoritism and injustice. To remedy these evils, the legislature, in 1830, specially prescribed the evidence which should be presented by the creditor ; and thus made the rights of the parties depend, not on the discretion of the officer, but on the law of the land. That this was a salutary provision can hardly be doubted ; but if it were otherwise, the remedy belongs to another branch of the government.

In referring to precedents to show how large a license had sometimes been taken in the construction of statutes, the appel-lant's counsel remarked, that there were subjects of legislative regulation where no one, from reading the statutes, could even *guess* what was the actual state of the law on those subjects. There is too much truth in this remark. But if the courts have sometimes gone very far towards taking the place of law-makers, it is but justice to say, that of late years they have been striving, both here and in England, to get back again into their appropri-ate sphere of action. Except in relation to a few old statutes

which were long since overwhelmed by commentaries and decisions, the current of authority at the present day is in favor of reading statutes according to the natural and most obvious import of the language without resorting to subtle and forced constructions for the purpose of either limiting or extending their operation. Courts cannot correct what they may deem either excesses or omissions in legislation, nor relieve against the occasionally harsh operation of statutory provisions, without the danger of doing vastly more mischief than good. Let us take, for example, the statutes of frauds and of limitations, which have filled our books with legal adjudication. Had the plain and unequivocal language of those laws been rigidly followed, there would undoubtedly have been a few cases of great hardship ; but when it had once been settled that the statutes were not to be limited in their operation by over refined and artificial interpretations, men would have been able to understand and govern themselves by the law of the land, and an incalculable amount of legal controversy would have been avoided.

In the case at bar we are asked to go much further than the current of authority, either ancient or modern, will warrant. We are asked to overlook and disregard a new provision introduced into the law of redemptions in 1830, and to construe the the statute just as though the amendment had never been made. There is, I think, no principle upon which we can hold this a valid redemption.

The respondent, by receiving the money which had been paid to the sheriff, did not waive the objection to the sufficiency of the redemption. Her agent acted under the false representation that a copy of the docket had been presented to the sheriff ; and when the truth was discovered she offered to refund the money. It is not material that it was the sheriff, and not the appellant, who misled the respondent ; nor is it important to enquire whether the sheriff was governed by a bad motive. It is enough that the respondent acted upon information on which she had a right to rely, and which proved to be false. Indeed, if nothing whatever had been said, it is difficult to perceive how she could waive or

consent to forego an objection without knowing that any ground for making it existed.

The regular mode of testing the validity of the redemption was a direct proceeding to set aside the sheriff's deed; and in this section, where the question arises collaterally, I should have held the deed conclusive of the rights of the parties, if that ground had been taken at the proper time. But the parties have, I think, consented to litigate that question in this section. The invalidity of the redemption was set up in the answer; both parties have taken proofs on the question, and it has been the principal point of controversy in the cause. Had the appellant excepted to the answer for impertinence on the ground that the validity of the deed could not be questioned in this proceeding, the respondent would then have moved the supreme court, or filed her cross bill in the court of chancery, for the purpose of avoiding the deed. But no exception to the answer was taken. So far as appears, the appellant suffered the cause to proceed to a hearing and a decree in the court below, without any question as to this mode of trying the right; and now, after a decision against him on the merits, he objects for the first time, and in a court of review, to the form of the remedy. The objection comes too late. We cannot yield to it without working great injustice.

It was said by the appellant's counsel that the sheriff, under the Barker judgment, sold in one lot several parcels of land which should have been put up separately, and that the sale was consequently void. If the objection were well founded in point of fact, and if it could be raised in this collateral proceeding, it is a sufficient answer to it that the question is not made by the pleadings. The appellant in his bill does not attempt any impeachment of the sheriff's sale. On the contrary, he expressly affirms the sale, and claims a title under it.

There is another ground on which the cause might, perhaps, be safely placed. If the sheriff in his discretion might dispense with the proof required by the statute when the appellant came to redeem, equity requires that he should have been equally in-

dulgent to the respondent.   But I forbear to examine that question, preferring to rest my opinion on the broad ground that there was no redemption, and that the respondent has done nothing to preclude herself from making the objection.

I think the decree of the chancellor is right, and that it should be affirmed.

On the question being put, *Shall this decree be reversed ?* all the members of the court, 23 being present, voted in the negative.

Whereupon the decree of the chancellor was unanimously AFFIRMED.